(No. 36445.—

EVELYN HARPER, Defendant in Error, *vs.* INDUSTRIAL COMMISSION *et al.*—(THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, Plaintiff in Error.)

*Opinion filed January 23, 1962.—Rehearing denied March 22, 1962.*

104

EDWARD F. O'MALLEY, CHARLES H. WITTENBERG, and JOHN J. DRISCOLL, all of East St. Louis, for plaintiff in error.

DREMAN and STERLING, of Belleville, (C. C. DREMAN, of counsel,) of defendant in error.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

In June of 1956, Thomas Harper, an employee of the Great Atlantic & Pacific Tea Company sustained an injury to his back while working at the company's warehouse. His condition was subsequently diagnosed as a herniated or ruptured disc, and a laminectomy was performed and the disc removed. On March 18, 1957, his body was found in a parking lot, lying next to the open door of his car. He was dead from a self-inflicted shotgun wound. A note

found in the car read "have a good wife & child just in pain."

On behalf of herself and her minor child, his widow filed with the Industrial Commission a petition which alleged that on June 4, 1956, during the course of his employment by the company, her husband suffered an accidental injury which resulted in his death on March 18, 1957. Evidence was heard before an arbitrator, who found that the injury which Harper sustained caused his death and that the widow was entitled to an award based upon that finding. On review the Commission heard no evidence. It agreed that Harper had sustained accidental injuries arising out of and in the course of his employment, but it also found that his death "was not occasioned by or related to those injuries." The Commission therefore set aside the arbitrator's award. On *certiorari,* the circuit court of St. Clair County held that the Commission's finding was contrary to the manifest weight of the evidence, set aside the decision of the Commission, and reinstated the compensation award. We allowed the company's petition for writ of error.

The record shows that before he was injured Harper was a friendly, sociable man with what was described as a "jolly" disposition. He was a good worker who did heavy work and was proud of his strength. After the accident, and particularly after his operation, he was noticeably less jovial. He read much more than before, and he copied some passages that he read and made notes of others. Many of his neighbors and fellow employees testified that his posture was altered, and he was described by some witnesses as being "humped over" and "all humped up." He was no longer able to cut the grass or to work around the house as he had before. Many witnesses testified that he complained of pain, and others that he appeared to be in pain or to be trying to hide pain. The complaints of pain and the appearance of pain continued up to the time of his death.

In response to a hypothetical question, a psychiatrist testified that in his opinion there was a causal connection between Harper's injury and his suicide. He testified that the injury caused a definite psychiatric illness with a probable diagnosis of severe chronic depression which later led to a lack of confidence in ability to perform in life situations. The orthopedic surgeon who performed the operation and treated Harper until he was released to return to work on March 11, 1957, testified that Harper did not complain of extreme or unusual pain or extraordinary discomfort, and that he found no evidence of pain that would cause him to injure himself, although he also stated that he did not know what effect his return to work on March 12 had produced. He also testified that pain may bring out hidden personality or behavior disturbances which would not occur in a normal individual.

This court has never been called upon to decide whether a death benefit may be awarded under the Workmen's Compensation Act when a compensable injury is followed by the suicide of the injured employee. The problem is not an easy one. A majority of the courts that have considered it have applied the tests enunciated in *In re Sponatski*, (1915) 220 Mass. 526, 108 N.E. 466, 468. There the court said that "where there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death, having knowledge of the physical consequences of the act, then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there

is a new and independent agency which breaks the chain of causation arising from the injury." 108 N.E. at 468.

Although the test formulated in the *Sponatski* case has been followed in a number of other jurisdictions, (see cases collected 143 A.L.R. 1227 and 56 A.L.R. 459) it has certain rather clear deficiencies. It seems to assume that a man's capacity to choose is a constant, unvariable factor, unaffected by whatever stresses may be brought to bear against it, and so it minimizes to the point of exclusion the possibility that capacity to choose may itself be impaired as the result of a compensable injury. If any degree of choice or volition remains, recovery is to be barred "even though choice is dominated and ruled by a disordered mind,"— which by hypothesis means a mind that has become disordered as the result of the injury for which compensation is sought. To us this underlying assumption of the *Sponatski* test is dubious, both from a medical and from a legal point of view. Neither the record before us, the briefs of the parties, nor the opinions that have adopted the *Sponatski* test suggest that its basic assumption rests upon responsible medical opinion. And so far as the law is concerned, it regularly recognizes, in a multitude of situations subsumed under the concept of duress, that freedom of choice may be so impaired by extrinsic pressures, physical and mental, as to deprive conduct of its normal legal significance.

The *Sponatski* test has been vigorously criticized for its failure to recognize the role which pain or despair may play in breaking down a rational mental process. (1 Larson, Workmen's Compensation, sec. 36.30 (1952); Horovitz, Injury and Death under Workmen's Compensation Laws, 134-136 (1944); 8 U.C.L.A. L.R. 673 (1961); 45 Iowa L.R. 669 (1960); *cf.* 1 U. of Chicago L.R. 105 (1933).) It has been pointed out that the rule that there can be no recovery unless the suicide occurs "through an uncontrollable impulse or in a delirium of frenzy without con-

scious volition to produce death," practically excludes from compensation those cases not marked by some violent or eccentric method of self-destruction. (1 Larson, Workmen's Compensation Law, sec. 36.20 (1952).) And it has been stated that it is erroneous as a matter of law to characterize a suicide as an intervening cause when it is attributable to a psychosis that results from a compensable injury. "The slashing of the wrist was an intervening act but not an intervening cause. An intervening cause is one occurring entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is the cause of that result." Fowler J. dissenting in *Barber* v. *Burrell Engineering Co.* (1942) 241 Wis. 461, 6 N.W.2d 199.

The workmen's compensation statutes of many States expressly preclude compensation if injury or death is "intentionally self-inflicted," or caused by the employee's "wilful intent to injure himself." It may be that in those jurisdictions a test that denies recovery when "choice is dominated and ruled by a disordered mind" is thought to be required by the statute, even though the disordered mind that impairs the capacity to choose is itself a product of a compensable injury. See, *e.g., Anderson* v. *Armour & Co.* (Minn. 1960) 101 N.W.2d 435; *Schofield* v. *White* (1959), 250 Ia. 571, 95 N.W.2d 40; *Mershon* v. *Missouri Public Service Corp.* (1949), 359 Mo. 257, 221 S.W.2d 165.

Unlike most States, our statute contains no such provision, and perhaps for that reason it was predicted that recovery would be permitted under it when impaired mental capacity is attributable to the injury. "Suicide and self-inflicted injuries are not accidental injuries within the meaning of the Compensation Act. Where, however, a workman has received an injury which caused a nervous breakdown, followed by terrible sufferings, long continued despondence or insanity, and if during such period he com-

mitted suicide, it would probably be attributed to the accidental injury and would be compensable. However, if the workman inflicts injury to his person for the purpose of collecting compensation this would not be considered accidental injury." 1 Angerstein, Illinois Workmen's Compensation, Rev. ed. 181.

In the absence of a statutory provision that bars recovery if every vestige of intent is not eliminated, we think that the proper approach was taken in *Whitehead* v. *Keene Roofing Co.* (Fla. 1949) 43 So. 2d 464, 465: "While the act of suicide may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and the death." See also *Burnight* v. *Industrial Accident Commission* (1960) 181 Cal. App. 2d 816, 5 Cal. Rep. 786, rehearing denied, 5 Cal. Rep. 794; *Pigney* v. *Pointers Transport Services, Ltd.* (1957) 2 All Eng. L.R. 807.

On Tuesday, March 12, 1958, when Harper returned to work after his operation, he was assigned to much lighter work than he had previously performed. He worked the remaining four days of that week in the cigarette department, and when he reported for work at 7:30 A.M. on Monday, March 18, he was assigned to still lighter work in the cosmetics department. He worked until 9:30 A.M., when he asked a fellow-employee to tell the supervisor he was leaving. He then drove rapidly to his home, about eight miles away, to get his shotgun. He left his home hurriedly, turning the corner "on two wheels," and drove to the tavern near the plant where his body was found. The evidence shows a clear connection between Harper's injury, his operation, the resulting pain and physical and mental changes, and his ultimate suicide. We find it unnecessary,

therefore, to attempt to assess the precise quality of his mental condition at the time of his suicide, or to determine if his conduct was the result of "an uncontrollable impulse," or occurred during a "delirium of frenzy."

The company argues that the Commission's finding in this case was not manifestly against the weight of the evidence, and that the circuit court therefore erred in setting it aside. But we think it clear upon this record that the Commission's finding, that Harper's death "was not occasioned by or related to" his injury, reflected its view of the law, and not of the facts. If its finding was intended as one of fact, it was properly set aside.

The judgment of the circuit court of St. Clair County is affirmed.

*Judgment affirmed.*