(No. 55855.—

JAKOB GOLDSAMT, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (Hart, Schaffner & Marx, Appellee).

*Opinion filed October 22, 1982.*

SIMON, J., dissenting.

Jordan Teplitz, of Jordan Teplitz, Ltd., of Chicago, for appellant.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (Thomas P. Smith, of counsel), for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

The 59-year-old claimant in this workmen's compensation case, Jakob Goldsamt, immigrated in 1950 to this country from Poland. He had served in the Polish army, been taken prisoner and subsequently interned in Hungarian and Austrian camps until freed in 1945 at the close of World War II. Claimant never married and apparently believed his family had been killed by the Nazis. In 1953 he commenced work as a fabric cutter for respondent, Hart, Schaffner and Marx. On August 31, 1972, in an apparent suicide attempt, claimant jumped from the ninth floor of respondent's building as a result of which both legs were amputated. Since his release from the hospital he has lived at a nursing home, the cost of which was, at the time of these hearings, apparently being paid by the State in the form of welfare payments.

Predicated upon a theory that his attempted suicide was caused by worry regarding changes in his working conditions and possible loss of his job, claimant filed a claim for benefits under the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.1 *et seq.*). The arbitrator found that claimant's injuries did not arise out of and in the course of his employment and denied compensation. That decision was affirmed by the Industrial Commission, whose judgment was, in turn, confirmed by

the circuit court of Cook County. Claimant appealed directly here under our Rule 302(a)(2). 73 Ill. 2d R. 302(a)(2).

In addition to his statements regarding the facts noted earlier herein, claimant's somewhat imprecise testimony may be fairly summarized as indicating that he had worried about proposed changes in working conditions which had apparently been discussed by the company, which was proposing them, and the union, which opposed them.

These proposals had been discussed at union meetings, some of which claimant attended. Claimant thought his earnings would be reduced and feared he would be unable to adjust to the changes, as a result of which he would lose his job. He suffered from a "bad stomach," diarrhea, varicose veins, arthritis in his right leg and rheumatism in his neck and shoulder. He was scheduled to have an X ray of his colon in the week following his suicide attempt. He lived alone, liked to read, and frequented the library. On the morning of August 31 he went to work at 8 a.m., hung up his coat with $500 in it for his friend, Victor Goldman, walked out on the ninth-floor fire escape and jumped.

Frank Hanus, a former Hart, Schaffner and Marx shop foreman who had retired in 1975, testified that the new work system started in April 1973. Under it cutters no longer cut out the entire suit or coat as they formerly had, but different cutters cut out different parts. The plan had been under discussion for a year prior to its implementation and had been opposed by the union because it was thought it would eliminate some of the cutters.

Victor Goldman testified he was claimant's friend and knew claimant had stomach and teeth problems. Claimant had complained about both health and work problems. The new work system did not go into effect until after claimant's injury. Under it, the witness testified his

earnings were 40% less. He "originally gave this case" to an attorney.

Dr. Adrian Finkelstein, a psychiatrist, testified as a witness for claimant that he saw claimant for 1 or 1½ hours on July 20, 1974. Dr. Finkelstein found no psychosis but testified, claimant had an "obsessive-compulsive personality," and "showed low spirits, bitterness about changes of work in his latest job." "[H]e felt he would be fired because of some of his liabilities, arthritis, varicose veins and colds that he would get very frequently." Claimant was sort of a "loner." He believed his family had been exterminated by the Nazis, and the doctor thought "he was experiencing extreme guilt toward his family." Because of that "he may be very prone to long standing depression and my diagnosis of obsessive-compulsive personality also can be seen as on a background of depressive-masochistic character, as I found in this patient." Claimant had apparently told the doctor that the conditions at work had already changed at the time of the attempted suicide, and Dr. Finkelstein testified that the changing conditions were "a very clear precipitating factor to his depressive neurosis." On cross-examination, however, he indicated it would make a difference in his opinion if, in fact, the changes did not occur until a year after the jump. On redirect examination the doctor stated that "just hearing about the possibility they would take place" would be sufficient to constitute "a precipitating factor" whether the changes could actually occur or not.

Dr. Earl Solon, a psychiatrist called by respondent, testified that he had been requested by one of the staff doctors at Henrotin Hospital to see claimant, who was then in intensive care. Dr. Solon stated that he saw claimant on September 3 and that claimant told him that claimant felt recently betrayed by a friend in whom he had reposed confidence. The doctor's impression was

"involutional psychosis with mixed paranoid and depressive features," but because claimant was in intensive care he was not able to be very cooperative. Claimant did not mention any work changes to Dr. Solon. Dr. Solon did see claimant on other occasions, apparently at Grant Hospital, and perhaps at the nursing home, although the details are unclear as a result of the doctor's notes regarding the later visits not being in the hospital files which had been brought to the hearing.

Thereafter the attorney representing claimant requested a report from Dr. Solon of his objective findings. The doctor responded that the injuries were the product of a psychiatric illness. A subsequent letter from the attorney indicated that claimant's past history put him in a mental condition where he could not cope with contemplated changes in employment conditions, thus making his life more meaningless and putting claimant in such a depressive state he attempted suicide. The doctor was asked to report on this and did so by letter to the attorney stating in relevant part:

"To the best of my recollection, during Mr. Goldsamt's hospitalization he never mentioned his job concerns at Hart, Schaffner & Marx in any way that it suggested that it contributed to his becoming emotionally ill. Apparently he is now doing so. However, it would not fit the observations and findings already described in the record to make this statement. Nor would it be compatible with our general understanding of paranoid psychotic processes to atribute [sic] this as a significant contributing factor to his illness. Were I to say that his job worries were a contributing factor in his illness, I would not be in a position to defend the statement."

Ronald Zizic, who had been payroll supervisor for respondent for nine years, identified payroll records showing claimant's earnings for eight months in 1972 to have been $8,727 as contrasted to $9,049 for all of 1971. On review before the Commission Mr. Zizic identified similar records for Victor Goldman showing his earnings for 1970, 1971,

1972, 1973, and 1974 to have been $8,814, $9,291, $11,065, $10,978, and $11,576, respectively.

Claimant has cited a number of cases from this and other jurisdictions, including *Harper v. Industrial Com.* (1962), 24 Ill. 2d 103, allowing recovery for pain-induced suicide following an employment-related back injury, and *Pathfinder Co. v. Industrial Com.* (1976), 62 Ill. 2d 556, 562, in which this court upheld an award for psychological disability resulting from "a sudden, severe emotional shock, traceable to a definite time and place and to a readily perceivable cause," even though no physical trauma or injury was sustained. He relies, too, on Professor Larson's comments in a Vanderbilt Law Review article, *Mental and Nervous Injury in Workmen's Compensation,* in which the author states:

> "The cases may be thought of in three groups: (1) mental stimulus causing physical injury; (2) physical trauma causing nervous injury; and (3) mental stimulus causing nervous injury. The first two categories are by now almost universally accepted as compensable. The third is the battleground where new law, reflecting the increasing ability of medicine and psychiatry to speak authoritatively on the causes and consequences of mental and nervous injury, is currently being developed." 23 Vand. L. Rev. 1243, 1244 (1970).

The problem here, however, is not the absence of physical injury, for we have severe injuries; rather, the question is one of causation. Was claimant's attempted suicide prompted in whole or in part by anxiety regarding the proposed changes in working conditions or is it reasonable to believe his depression may have resulted from causes other than those which were employment related? The arbitrator and Commission both found the latter to be the fact, and the only question before us is whether that finding is contrary to the manifest weight of the evidence. (*Segler v. Industrial Com.* (1980), 81 Ill. 2d 125, 129; *C. Iber & Sons, Inc. v. Industrial Com.* (1980), 81 Ill. 2d 130, 135.) The

trial judge held it was not, and we agree.

It is, of course, axiomatic that the burden rested upon claimant to establish by a preponderance of the evidence that his injury arose out of and in the course of his employment. (*Parsons v. Industrial Com.* (1981), 84 Ill. 2d 346, 349; *Ansell v. Industrial Com.* (1981), 85 Ill. 2d 69.) It is the function of the Commission to decide questions of fact and causation and judge the credibility of the witnesses; where differing inferences may reasonably be drawn from the evidence, those drawn by the Commission will not be disturbed. *White v. Industrial Com.* (1982), 88 Ill. 2d 523, 526; *Pazara v. Industrial Com.* (1980), 81 Ill. 2d 76, 80.

It is apparent from the testimony that claimant suffered from a number of physical ailments about which he had complained to a number of people. He had told Dr. Solon that he had recently been betrayed by a friend in whom he had formerly had confidence. Dr. Finkelstein believed claimant was experiencing extreme guilt toward his family. Too, claimant, in his initial interview with Dr. Solon several days after the suicide attempt, said nothing to the doctor regarding changing work conditions as a reason for his conduct; rather, he spoke of the friend who had betrayed him. In view of this testimony it is not unreasonable to presume that the uniform findings of the arbitrator and the Commission were prompted by their belief that the discussion of the work changes was not a causative factor in the suicide attempt. We cannot say that such a conclusion is contrary to the manifest weight of the evidence. *Board of Education v. Industrial Com.* (1980), 81 Ill. 2d 17, 21.

The judgment of the circuit court of Cook County is accordingly affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

The majority is right; the only question in this case is the factual one of causation: What prompted Goldsamt's

attempted suicide? Was it in whole or in part the proposed changes in working conditions at Hart, Schaffner & Marx? I believe that the manifest weight of the evidence supports Mr. Goldsamt's position that it was anxiety caused by the proposed work changes.

Although the arbitrator, the Commission, the circuit court, and now a majority of this court have each found that the attempted suicide was not caused by the work changes, these findings were based primarily on the testimony of one expert witness, Dr. Earl Solon. I find his testimony to be ambiguous and not very credible. When the weakness of Dr. Solon's testimony is acknowledged, it is apparent that the overwhelming weight of the evidence supports Mr. Goldsamt.

Hart, Schaffner & Marx proposed certain changes in working conditions for cutters before the suicide attempt, and Mr. Goldsamt was extemely anxious about the effects that those changes would have on him. Although the work changes were not implemented until after the attempted suicide, they had been under discussion as a proposal for at least a year. Mr. Goldsamt had attended several union meetings at which employees discussed their opposition to the changes. He testified that he was so "upset" by the proposed changes in working conditions that he "just jumped out."

Under the old work system which had been in effect as long as Mr. Goldsamt had worked at Hart, Schaffner & Marx, each cutter cut an entire suit. Under the new system each cutter only would cut a small portion of each suit. The union vigorously opposed the new system, fearing that it would move some cutters out of the cutting room and might lead to lower wages for cutters. Moreover, the evidence establishes that both the union and the employer foresaw that some older employees like Mr. Goldsamt might not be able to cope with the new system and would have to be dismissed.

The proposed changes in working conditions, however, represented much more to cutters like Jakob Goldsamt than the dangers of lower pay and early retirement. By moving some cutters out of the cutting room and by abolishing the cutters' traditional work patterns, the new work system threatened to destroy the trade to which Jakob Goldsamt had devoted most of his working life after coming to the United States. A union official testified that the new work system was a devastating blow to the cutters' pride in their work "[b]ecause it would eliminate a number of men out of the cutting room. The cutting was a trade. It was a trade and by putting in [the new] system, they threw the trade out the window."

Dr. Adrian Finkelstein, a psychiatrist, testified that Goldsamt's concern with the proposed work changes was "a clear precipitating factor" in the suicide attempt. "[T]he working conditions triggered his state of mind and then his desperation \*\*\*." The doctor noted that it was irrelevant whether the work changes had been implemented at the time of the suicide attempt; "just hearing about the possibility they would take place" would be enough to cause Mr. Goldsamt's condition. In concluding that the proposed work changes caused the suicide attempt, Dr. Finkelstein placed special significance upon the situs of the suicide attempt—the Hart, Schaffner & Marx factory: "I see it more pertinent for him to attempt to do something there where he is close to his work situation and bothered by the work situation than \*\*\* jumping from a bridge."

In contrast, Dr. Solon observed that he had no independent recollection of his observations of Mr. Goldsamt; he could only testify by reference to notes that he had made in his first interview with the patient and by reference to a letter that he had sent to Goldsamt's counsel. The interview occurred only three days after the suicide attempt and was conducted in the intensive-care ward of the hospital to which Goldsamt was brought. Dr. Solon admitted

that because of Mr. Goldsamt's precarious condition he "was not able to be very cooperative." Under these conditions and after what he had been through I do not see how anyone could expect Jakob Goldsamt to have been logical in this interview or to remember the circumstances and causes of his suicide attempt. Dr. Solon himself conceded that Goldsamt's consciousness of why he had attempted suicide may well have been obliterated by the time he was interviewed in the hospital.

In its effort to infuse Dr. Solon's hospital interview with some significance, the majority emphasizes the passage in Dr. Solon's interview notes relating that the patient felt he had been "recently betrayed by a friend in whom he has [placed] his confidence." This reference is ambiguous at best and does not establish the alleged betrayal as an independent precipitating factor in the suicide attempt. Dr. Finkelstein testified that he did not believe that the alleged betrayal had anything to do with the suicide attempt. Moreover, Goldsamt was never asked whàt he meant when he said in the hospital interview that he felt betrayed by a "friend." It is understandable that a person who had three days before undergone serious physical and mental trauma, who after his entire family perished in the horrors of Nazi concentration camps came to this country to live a lonely and secluded life with few social contacts, and who only spoke English imperfectly, might refer allegorically to Hart, Schaffner & Marx, his employer of 20 years, as a "friend." The record contains no other clue as to the identity of the "friend."

The majority opinion also relies strongly on the letter to Mr. Goldsamt's counsel in which Dr. Solon observed that the patient had never mentioned the proposed work changes during the course of his treatment. The letter also observed that it would be inconsistent with the "general understanding of paranoid psychotic processes to [attribute] this as a significant contributing factor *to his illness.*"

(Emphasis added.) Later testimony by Dr. Solon, however, makes clear that he did not mean that the proposed work changes were not a substantial precipitating factor in causing the suicide attempt; the doctor simply meant that the work changes were not the cause of Mr. Goldsamt's preexisting mental condition of isolation and depression.

Dr. Solon explained that, in attempting suicide, Mr. Goldsamt subconsciously was hoping to escape "[f]rom things that were distressing him." Observing that "[t]he job is a part of a man's meaning and place," Dr. Solon conceded that anxiety over the work changes might have partly caused the suicide attempt. The doctor described the work changes as a "final blow" to Mr. Goldsamt, one which substantially aggravated his preexisting mental condition, and which was one of the aggravating factors that caused him to jump. Testifying in medical terms and not in legal conclusions, Dr. Solon appeared to be saying that the proposed work changes were a factor causing substantial aggravation to Mr. Goldsamt's preexisting mental condition and that those changes may have provided a crucial catalyst in causing the suicide attempt. A work-related aggravation of a preexisting condition is compensible. See *Brooks v. Industrial Com.* (1979), 78 Ill. 2d 150, 155; *Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 240.

Given the weakness and ambiguity of Dr. Solon's testimony, I do not think that it warrants the substantial reliance that the majority places on it. Even if this reliance were appropriate, I believe that it actually supports an award in this case. The overwhelming credible evidence favors the claimant's position that the proposed changes in working conditions were a substantial precipitating factor in the suicide attempt. I especially note that no substantial evidence was introduced to establish other reasons for what Goldsamt did. His physical ailments, his guilt feelings toward his family, and the suggestion that the "friend"

was a person, all referred to by the majority, are all speculations with no evidence establishing they were the reasons. I would reverse the findings of the circuit court and remand this cause to the Commission for the determination of an appropriate award.