THERESE BOCIAN *et al.*, Appellees, v. THE INDUSTRIAL COMMISSION *et al.* (The Town of Cicero Fire Department, Appellant).

First District (Industrial Commission Division)   No. 1—95—0228WC

Opinion filed May 17, 1996.—Rehearing denied August 2, 1996.

Nyhan, Pfister, Bambrick & Kinzie, P.C., of Chicago (Edward Pfister and Bruce Crofts, of counsel), for appellant.

Lannon, Lannon & Barr, Ltd., of Chicago (Richard J. Barr, Jr., of counsel), for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

The claimants, Therese Bocian and John Bocian, surviving widow and son of Ralph Bocian, brought an action for death benefits under section 7 of the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1991, ch. 48, par. 138.1 *et seq.* (now 820 ILCS Ann. 305/1 *et seq.* (Michie 1995))). The arbitrator found that Ralph, while employed by the Town of Cicero Fire Department (the employer), sustained accidental injuries which caused his death by suicide. The arbitrator awarded compensation to the claimants.

On review, the Illinois Industrial Commission (the Commission), with one dissent, determined that the claimants had failed to prove a causal connection between Ralph's work-related injuries and his subsequent suicide, and therefore denied claimants' claim for benefits. The circuit court of Cook County reversed and remanded

the decision of the Commission, holding that the Commission's finding that claimants failed to establish a causal connection was against the manifest weight of the evidence. The employer appealed the order of the circuit court. We affirm.

FACTS

The parties stipulated that Ralph, a 49-year-old firefighter, committed suicide on May 21, 1990. The parties also stipulated that he sustained accidental injuries to his left arm arising out of and in the course of his employment on January 4, 1988. This injury caused a tear in the biceps muscle of the left arm. He returned to work on February 8, 1988; however, he continued to complain of numbness and tingling in his left arm even after he returned to work.

The parties further stipulated that Ralph sustained a second accidental injury arising out of and in the course of his employment on October 28, 1989. This injury caused a herniated disc in his neck and compression of the thecal sac, with obliteration of the nerve roots on the left side.

In April 1990, Ralph received a letter from the employer's workers' compensation insurance carrier informing him that the claim for the second injury was being denied and he should return to work. Ralph, however, never returned to work as a firefighter following the second injury.

Therese testified that Ralph had been a firefighter since 1965, had risen to the rank of lieutenant, and was in command of his own firehouse. He was a serious, "down to earth" person who always worried about having a job. She testified to several changes in Ralph following his accidents. Prior to his accidents he was a very active and outgoing individual who enjoyed his work as a firefighter and enjoyed the responsibility of his rank. He also enjoyed working with his hands and for several years had operated a business on the side doing electrical work. After the accidents, Ralph, who was left-handed, complained of constant pain in his left arm and side. He appeared to Therese to be lifeless, moody and lacking in enthusiasm. He also appeared to her to be in constant pain. He complained that his physical therapy treatments were not helping. After the second accident, Ralph started drinking to the point where Therese considered him to be an alcoholic.

Therese further testified that after the second accident, Ralph would sit in a chair all day and complain of pain in his left arm and side. He was depressed because he could not find anything to relieve his pain. He was no longer able to hold anything in his left hand, and because he was left-handed, he was no longer able to work at his electrical business.

After the second accident, Ralph became very distraught over the family's financial future. He apologized to the family for "ruining their lives" and told them that they would be better off with him out of their lives, that he was bringing nothing but pain to them because of his injury. He became convinced that he "was going to lose his job," and "they would not have any money." Therese testified that Ralph discussed death with her three or four times in the few weeks preceding his suicide. He had never mentioned suicide in her presence on any previous occasion.

Although Ralph was receiving full salary, he would only continue to do so for one year after the accident. In January 1990, he was notified by the employer's worker's compensation insurance carrier that its examining physician had determined he was capable of returning to work. Ralph believed, however, that he would be physically unable to return to work due to the constant pain in his neck, shoulder and left arm. Therese testified that Ralph was afraid of losing his job for disobeying an order to return to work.

The record indicates that, in March 1990, Ralph filled out a disability pension application. He did not submit the application to the employer as he was waiting for a letter from his treating physician, Dr. John Shea. Ralph anticipated that the letter from Dr. Shea would indicate that he was disabled and could not perform the duties of a firefighter. His plan, according to Therese, was to submit the letter along with the application. When Ralph received Dr. Shea's letter he became distraught, as it did not contain a statement that he was unable to perform the duties of a firefighter due to a disability. The letter merely stated that Ralph was currently unable to work and suggested that he undergo further tests to determine his future ability to work.

Other witnesses testified from personal knowledge that Ralph was extremely distraught when he received the letter from Dr. Shea. Ralph expressed to them his belief that the letter meant the financial ruin of his family.

In spite of Ralph's apparent despair over his financial situation, the record indicates that Ralph could have retired from the fire department on his fiftieth birthday, March 9, 1991. He would have received a 50% pension upon retirement or a 65% pension if his retirement had been based upon disability.

Mark Steinhagen testified that he had worked with Ralph as a firefighter for approximately four years, and he had also assisted Ralph with his appliance repair business. He testified that Ralph enjoyed being a fireman and was looked up to as a "father, big brother, and mentor" by the other firefighters.

Steinhagen further testified that after the second accident, Ralph "was not himself." He complained of pain in his left arm and that he had no overhead mobility. He was unable, due to the pain in his left arm, to continue helping Steinhagen renovate an apartment building. He apologized for not being able to work and became withdrawn, solemn and moody. Steinhagen testified that Ralph began to drink heavily after the second accident. Although Ralph and Steinhagen had been constant companions prior to the second accident, afterward Ralph seemed to be avoiding him. Steinhagen was asked if he had ever heard Ralph discuss suicide. He responded, "I think he mentioned it once." The record does not indicate whether this one mention of suicide occurred before or after Ralph's injuries.

Dennis Raleigh, a neighbor, friend and co-worker of Ralph's, testified that he knew Ralph since 1972. Raleigh described Ralph as having mood swings. At times he would be explosive and easily prone to displays of anger and rage. At other times, according to Raleigh, he "was the nicest person in the world." Raleigh believed that Ralph always had a "negative attitude" that never changed even after his injuries. When asked if he noticed any personality changes after the injuries, Raleigh stated that "Ralph was Ralph all the time I knew him from 1972 until his death."

Raleigh also testified that Ralph had spoken to him of suicide several times "through the years." On direct examination, Raleigh testified:

"Q. Before his death did he ever discuss with you him wanting to commit suicide?

A. Through all the years I knew him a lot of times he would make the statement that if I had a gun I would shoot myself. I never had any concern for those thoughts because he used the words if I had a gun I'd shoot myself. It never dawned that he would do anything of that nature."

Raleigh testified that these discussions occurred when they were discussing firehouse matters or people, subjects that easily excited Ralph. Upon cross-examination, Raleigh testified:

"Q. Whenever he would say all these things about if he had a gun he would shoot himself, you didn't take him serious[ly], did you?

A. No, sir.

Q. Over what period of time did he make those comments? When was the first time you heard him say it? After you moved in?

A. I couldn't put a time frame on it, but I would have to say—I started working at the fire house back in about '86; maybe a couple of times during that period from '86 to '91 or '90, I heard him mention that, I couldn't put a time frame."

Q. And he never said it before that?

A. I don't recall it.

Q. So the first time you ever remember hearing him say it was sometime between 1986 or 1990, but you don't recall when?

A. I don't recall. I probably started talking to him more because of our work relationship.

Q. Could it have been after the injuries that he said that?

A. It's quite possible."

Raleigh's testimony was key to the Commission's determination that Ralph had contemplated suicide in the years prior to the accident and was therefore "a suicide waiting to happen." In reversing the Commission, the trial judge noted that Raleigh's testimony did not support such an inference.

Dr. Michael Solomon, a board-certified psychiatrist, gave an evidence deposition on behalf of the claimants. In preparation for his testimony, he interviewed Therese and Steinhagen, reviewed Ralph's medical records, and reviewed the transcripts of prior arbitration testimony.

Dr. Solomon opined that Ralph exhibited all nine diagnostic indicators of major depression. He further opined that the October 28, 1989, injury, combined with Ralph's subsequent inability to return to work, produced stress that led to the onset of major depression. This major depression, in turn, led to his suicide seven months later. Dr. Solomon based his opinion on the following: (1) a general change in Ralph's personality that began with the second accident; (2) Ralph started drinking heavily after the second accident; (3) around March 1990 Ralph began to become "overapologetic" about being a burden on his family; (4) around this same time he developed sleep disturbances; (5) he began to withdraw from his family and friends; and (6) he began expressing suicidal thoughts.

Dr. Solomon further opined that Ralph's severe depression brought on a distorted view of his financial situation, to the point were he saw his financial future as "bleak" and "hopeless," causing a despair that ultimately led to his suicide.

Dr. Daniel Hardy, a board-certified psychiatrist and neurologist, specializing in forensic psychiatry, gave an evidence deposition on behalf of the employer. In preparation for his testimony, Dr. Hardy reviewed the testimony of Ralph's family members and co-workers, Dr. Solomon's deposition, a confidential psychological profile of Ralph prepared for the employer in 1978 on the occasion of Ralph's application for promotion, and the various medical records.

Dr. Hardy concurred in Dr. Solomon's diagnosis that Ralph met the diagnostic indicators leading to a conclusion that Ralph suffered

from major depression. Dr. Hardy opined, however, that there was no causal connection between Ralph's accidental injuries and his suicide. Dr. Hardy based his opinion on the following factual determinations: (1) his determination from the testimony that Ralph had been unhappy for several years; (2) at times Ralph had violent mood swings and an explosive temper; (3) Ralph had been suffering from some form of depression for several years prior to his suicide; (4) his consumption of alcohol increased dramatically in the later months of 1989; (5) the fact that Therese had previously suffered from breast cancer, even though her most recent consultation prior to Ralph's death revealed no evidence of recurrence; and (6) the fact that Ralph had been estranged from his mother for several years, although his mother had been dead for several years prior to his suicide. Dr. Hardy characterized Ralph as "a suicide waiting to happen."

Dr. Hardy conceded that it was possible that Ralph's work injuries caused his depression, in the same manner "as anything is possible." He agreed, however, that evidence of major depression did not appear until after the second accident, more specifically the last two months prior to Ralph's death. He agreed with Dr. Solomon's conclusion that Ralph did not manifest any symptoms of major depression prior to the October 28, 1989, accident.

Dr. Hardy had no explanation for the evolution of Ralph's depression, which he had suffered for years, into a major depression that only appeared sometime after the work-related injuries. Dr. Hardy testified as follows:

"Q. You only found major depression in the last few months before his death; is that correct?

A. Consistent with the report of Dr. Solomon.

Q. Couldn't something have been the triggering factor to cause his depression to become a major depression?

A. I think either you have misunderstood or I haven't properly explained when I spoke earlier of Mr. Bocian being an unhappy man. I am not diagnosing him. I am describing him.

Only in the last few months when he began to have evidence of inappropriate guilt, was he at a point where I think most people would agree *** that he was probably suffering from major depression.

It is not clear how the course of the disorder developed."

Dr. Hardy described the receipt of Dr. Shea's letter by the decedent as a "triggering event for the suicide." Dr. Hardy testified as follows:

"Q. *** If [the decedent] was under the impression that he was going to lose his job and at least a significant portion of his income,

could that have been a major enough stressor to trigger the major depression.

A. Now we are talking about something that, in my judgment is significant. I think it is clear that he was very significantly upset by the content of Dr. Shea's letter. And this distress and upset preceded his death by only a matter of days.

If one is looking for a triggering event for the suicide, I suspect one can look to that letter and Mr. Bocian's misinterpretation of it based on his disordered thinking."

The Commission found that the evidence showed Ralph was "an unhappy, explosive individual who had made statements throughout the years that if he had a gun he would shoot himself." The Commission further determined that Dr. Hardy's opinion was entitled to more weight than was Dr. Solomon's opinion. The Commission therefore concluded, with one dissent, that "the decedent's suicide was causally connected to [his] distorted view of his future and his financial situation, and it was not causally connected to [his] suffering from physical pains as a result of the January 4, 1988, and October 28, 1989, accidents."

The trial court reversed the decision of the Commission. In ruling that the Commission's decision was against the manifest weight of the evidence, the trial court found that a conclusion opposite the Commission's was clearly apparent from the evidence. The court determined that all the credible evidence led to the conclusion that an unbroken chain of events led from Ralph's work injuries to his suicide. The court further determined that a conclusion that a causal relationship between the work injuries and the suicide was clearly apparent from the evidence. For the reasons stated below, we agree.

### ANALYSIS

■ Whether a suicide arose out of and in the course of a decedent's employment is a question of fact for the Commission, and the Commission's determination will not be set aside unless it is contrary to the manifest weight of the evidence. *City of Streator v. Industrial Comm'n*, 92 Ill. 2d 353 (1982). In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Montgomery Elevator Co. v. Industrial Comm'n*, 244 Ill. App. 3d 563, 567 (1993). Our review of the record leads us to conclude that the circuit court was correct in determining that a conclusion opposite that reached by the Commission was clearly apparent.

In order to reach a proper conclusion, it is helpful to trace the evolution of the law regarding the compensability of suicide. Our

supreme court first held in *Harper v. Industrial Comm'n*, 24 Ill. 2d 103 (1962), that an employee's suicide could be compensable under the Act where it was causally related to a prior injury arising out of and in the scope of employment. In addressing the issue of causation, the court held that where there exists "an unbroken chain" from the work-related injury to the suicide such that "without the injury, there would have been no suicide," causation is established and the death should be compensable. In reaching that conclusion, the court noted:

> "While the act of suicide may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an un- broken chain of events from the injury to the death, and not a *cause* intervening between the injury and the death." (Emphasis in original.) *Harper*, 24 Ill. 2d at 109.

The *Harper* court, quoting Professor Larson's treatise, Work- men's Compensation Law, further noted:

> " 'The [suicidal act] was an intervening act but not an intervening cause. An intervening cause is one occurring *entirely independent* of a prior cause. When a first cause produces a second cause that produces a result, the first cause is the cause of that result.' " (Emphasis added.) *Harper*, 24 Ill. 2d at 108, quoting 1 A. Larson, Workmen's Compensation Law § 36.20 (1952).

Our supreme court next addressed the issue of the compensabil- ity of suicide in *County of Cook v. Industrial Comm'n*, 87 Ill. 2d 204, 206 (1981), where it held that "benefits should be awarded when a compensable injury gives rise to pain and depression that drive an employee to suicide."

In *City of Streator v. Industrial Comm'n*, 92 Ill. 2d 353 (1982), our supreme court, expanding on *Harper* and *County of Cook*, held that in order for a suicide to be compensable it is not necessary to estab- lish that the work-related injury was the sole or even principal cause of the suicide. Petitioners are not required to prove any particular mental state of the decedent at the time he or she committed suicide, nor are they required to establish causation through expert medical testimony. Petitioners need only show some evidence from which the reasonable inference can be drawn that the injury was "a causative factor." *City of Streator*, 92 Ill. 2d at 364.

◼ Applying the law as outlined above to the facts in the matter *sub judice*, the claimants presented overwhelming evidence to estab- lish the reasonable inference that Ralph's injury, which ended his

ability to work as a firefighter, was "a causative factor" in his suicide.

It is undisputed that Ralph was suffering from major depression at the time he took his own life. It is also undisputed that his major depression was the direct or immediate cause of his suicide. The pivotal question is then, under the test first articulated in *Harper* and later refined in *County of Cook* and *City of Streator*, whether Ralph's suicide was "part of an unbroken chain of events from injury to death," or was his suicide an "independent intervening cause" that would have occurred even in the absence of the injuries.

The Commission determined, based upon the opinion of Dr. Hardy, that Ralph was an unhappy person and "a suicide waiting to happen." The Commission cited Dr. Hardy's opinion prominently in support of the decision to deny compensation. The statement, however, that Ralph was "a suicide waiting to happen" is of little or no assistance in determining causation under the test articulated in *Harper* and *City of Streator*. It is well settled that an employer takes his employees as he finds them. *County of Cook v. Industrial Comm'n*, 69 Ill. 2d 10, 17 (1977). Thus, assuming, *arguendo*, that Ralph was an unhappy "suicide waiting to happen" and that any sufficiently traumatic event could have caused him to commit suicide, the question still remains unanswered whether the work-related injuries were "a causative factor" in the suicide.

The record is replete with testimony from family members, coworkers and friends indicating that the date of Ralph's second work-related injury was a line of demarcation in his mental and physical condition. Both medical experts agreed that Ralph's suicide was precipitated by a psychiatric condition known as major depression. Both experts also agreed that this major depression did not manifest itself until sometime after the work-related injuries occurred. Both experts further agreed that the receipt of Dr. Shea's letter, *concerning the effect of his work-related injuries on his future ability to work*, was the "triggering event" in Ralph's suicide.

Based upon these facts, we believe that the record clearly establishes that an unbroken chain of events began with Ralph's work-related injuries, which led to the completely unprecedented manifestation of a psychological illness known as major depression, which in turn led to Ralph's suicide, triggered by his reaction to Dr. Shea's letter regarding the current state of his work-related injuries. Thus, the claimants satisfied a burden of proving that Ralph's suicide was causally connected to his work-related injuries.

Just as the record appears to overwhelmingly support the finding that Ralph's suicide was part of an unbroken chain from the work-

related injuries to his death, the record is nearly devoid of any evidence supporting the conclusion that the suicide was in any way an "intervening cause" breaking the chain. Dr. Hardy testified that in his opinion Ralph had been suffering from depression for "several years" prior to the suicide. He conceded, however, that individuals often function for years with depression. Although he steadfastly maintained his opinion that the work-related injuries had no causative effect on Ralph's suicide, he conceded that Ralph's condition apparently developed into major depression only at some point after the second accident. When asked what triggered the onset of major depression, Dr. Hardy could only state that "it is not clear how the course of the disorder developed."

Dr. Hardy also maintained that two events, in his opinion, were more significant to him than the work-related injuries in explaining the suicide. The first was the fact that Therese had been diagnosed with breast cancer several years prior to the suicide, although it appears she had been cancer free for several years. The second was that Ralph had an estranged relationship with his mother for several years up to the time of her death, again many years prior to his suicide.

The employer maintains that the opinion of Dr. Hardy supports the Commission's ruling and the courts of review must defer to the Commission's determination. Even under the manifest weight of the evidence standard of review, however, complete deference to the Commission's determination is not required. As this court has previously stated, "[w]hile we are not easily moved to set aside a Commission decision on a factual question, we will not hesitate to do so where the clearly evident, plain, and indisputable weight of the evidence compels an apparent, opposite conclusion." *Montgomery Elevator*, 244 Ill. App. 3d at 567.

In the matter *sub judice*, the opposite conclusion from that reached by the Commission is clearly apparent. All the evidence in the record clearly, plainly and indisputably establishes that the onset of Ralph's major depression began no sooner than his work-related accidents, particularly the accident of October 28, 1989. Likewise, the record indisputably establishes that Ralph's suicide was the product of this major depression, and more importantly, the letter from Dr. Shea was the "triggering event" which led to the suicide. Since Dr. Shea's letter concerned the status of Ralph's work-related injury, it must be concluded that the "unbroken chain" of causation connected his work-related injuries to his suicide.

Dr. Hardy's theories about the importance of Ralph's mother and Therese's cancer, both several years prior to the suicide, are unsup-

ported by the record. Dr. Hardy's own testimony that the onset of major depression coincided with Ralph's work-related injuries, and his opinion of the importance of Dr. Shea's letter as a "triggering event," fail to support his reliance on the two other factors to support his conclusion. The evidence simply does not support Dr. Hardy's ultimate conclusion that the work-related injuries were not a causative factor in Ralph's suicide.

■ We also find it significant that the Commission held that the claimants were not entitled to compensation because they had failed to prove that Ralph's suicide was caused by his "suffering from physical pain as a result of the January 4, 1988, and the October 28, 1989, accidental injuries." This statement leads us to conclude that the Commission required the claimants to prove that unbearable physical pain alone drove Ralph to suicide. It is not necessary, however, for the claimants to prove unbearable physical pain drove an employee to suicide. The test for causation articulated in *Harper*, *County of Cook*, and *City of Streator* does not state a rule that only unbearable physical pain from work-related injuries will cause a suicide to be compensable.

In *Harper*, the decedent's treating physician specifically testified that the decedent was not in pain, yet our supreme court upheld the compensability of the suicide, since a causal connection was otherwise established. *Harper*, 24 Ill. 2d at 108-09. To the extent that the Commission's determination that the claimants failed to prove that Ralph was driven to suicide by unbearable pain dictated the Commission's findings on causation, that decision is erroneous as a matter of law.

### CONCLUSION

Based upon the foregoing, the decision of the Commission that the claimants failed to prove the requisite causal connection between Ralph's work-related injuries and his subsequent suicide was against the manifest weight of the evidence. The circuit court correctly reversed and remanded the decision of the Commission.

The order of the circuit court of Cook County is affirmed.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, COLWELL, and RARICK, JJ., concur.