(No. 16439.—Judgment affirmed.)

THE HARRISBURG COAL MINING COMPANY, Plaintiff in Error, vs. THE INDUSTRIAL COMMISSION et al.—(EDDIE MILLER, Defendant in Error.)

*Opinion filed February 17, 1925.*

1. WORKMEN'S COMPENSATION—*claimant must prove case by a preponderance of evidence.*  A claimant for compensation must prove his case by the greatest weight of the evidence, and the rule in this respect is the same as in a common law action.

2. SAME—*when evidence is sufficient for award for permanent partial incapacity from electric shock.*  Evidence that an employee received an electric shock from a cable carrying a high voltage, which was sufficient to render him dazed or unconscious for a brief period, and that since receiving the shock he has been unable to perform manual labor of any kind because of hystero-neurasthenia, is sufficient to justify an award for permanent partial incapacity. (*United States Fuel Co.* v. *Industrial Com.* 313 Ill. 590, followed.)

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. A. E. SOMERS, Judge, presiding.

MILEY & COMBE, (SAMUEL A. HARPER, of counsel,) for plaintiff in error.

A. W. KERR, and JAMES B. LEWIS, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

Eddie Miller, employed in the coal mine of plaintiff in error, while engaged in the line of his employment received an electric shock October 28, 1921, for which he filed a claim for compensation.  The claim was heard by an arbitrator in March, 1922, who made an award of $12 for one week and $16 per week for 265 weeks under paragraph (*f*) of section 8 of the Compensation act, aggregating $4252, for the reason that the injury caused complete disability and rendered him permanently incapable of work.  Upon a review on the petition of plaintiff in error the Industrial

Commission sustained the award made by the arbitrator. The cause was removed to the circuit court by *certiorari*, where the award was set aside and the cause remanded to the commission for further proceedings. The cause was re-heard by that body in January, 1924, and an award made under paragraph (*d*) of section 8 of the act of $10.20 per week for the period of 416 weeks, aggregating $4243.50. That award was confirmed by the circuit court, and this court granted a writ of error to review the decision.

Plaintiff in error says in its brief that the only questions in the case are "whether the present conditions of the claimant are the proximate results of the electric shock, and the nature and extent of the injury, if any."

At the time of his injury Miller was thirty-two years old. He testified on the hearing before the arbitrator that he was working on a machine undercutting coal, operated by an alternating current of electricity of 250 volts. He had gloves on and caught hold of a cable where the insulation was worn and imperfect and held it two or three minutes while the current passed through his body. He was in a damp entry and his feet were wet. It dazed him at the time and the sweat "popped" out on him. He continued to work a little while after the accident, then left the mine and went home. He testified since the injury his eyes have been affected; that the light hurts them and he has to use glasses to read. His nervous system and heart were affected. He had not been able to work since and had not attempted to. He had no strength, could not sleep well, and a little exercise disturbed his nervous system. He had no heart trouble before the accident. He had a listless feeling and no ambition. The symptoms he described began a few days after the injury. He consulted Dr. Davidson on November 4, and had been examined by Dr. Hick, Dr. Moore and Dr. McSparin. He said he had a nervous breakdown January 17. Up to that time he had been walking around and had visited neighboring towns.

The other evidence heard before the arbitrator was the testimony of doctors. There were no physical signs of the shock left on the body of Miller. Dr. Davidson, his family physician, treated him after the accident, and testified he had low blood pressure, complained of fatigue and nervousness and said the light hurt his eyes. The doctor never before treated a patient suffering from electric shock and knew nothing about the effects, except that if severe enough it would affect the nervous system. In January, 1922, the witness and Dr. McSparin both treated Miller. He described his symptoms, said he did not have flu, and he could not say whether his condition was permanent or not. Dr. McSparin testified that in January, 1922, Miller had the flu, ran a temperature of 103, had a sore throat, his eyes were very sensitive to light, and he was in a semicomatose condition. The doctor was informed of Miller's electric shock, but said he saw no connection between that and his then condition. He could not state whether Miller was able to perform labor. He testified a high voltage electric current would have immediate effect, which would be noticeable within from twenty-four to forty-eight hours. Dr. Moore saw and examined Miller on December 14, 1921. He described his general appearance as being that of a man in a reasonably good physical condition, with no organic trouble. His blood pressure was normal, and he detected no muscle spasms or anything else of a disabling nature which would render him incapable of work. He testified the effects of an electric shock were immediate and would last but a short time. He said a man could have resultant hysteria from an electric shock, which would leave no sign but would disable a man from work as completely as a physical impediment. He said that kind of a case was a very bad case for treatment, so far as disability was concerned. Dr. Hick examined Miller on December 28, 1921, and so far as he could see, his physical condition was normal and his blood pressure normal. The only objective

findings were bad teeth, and the doctor thought Miller was able to work. He said he found nothing to indicate Miller was malingering.

This is, we believe, a brief summary of the material part of the testimony heard by the arbitrator. On review before the Industrial Commission additional testimony was introduced. J. L. Mason, an electrician of fifteen years' experience, testified the voltage where Miller was working was a 210 alternating current. The witness has had much experience with electric shocks and said the effect was immediate. Some men are more sensitive to electric currents than others. Dr. McSparin testified again that Miller had influenza in January, 1922; that he treated him in connection with Dr. Davidson, and that was the agreed diagnosis. Dr. Roberts testified he examined Miller on June 10, 1922, and that Miller gave him a complete history of receiving the electric shock and what he did immediately following it. Miller told the doctor he left the mine, washed, changed his clothes unassisted and rode to his home in an automobile, a distance of four miles; that he was confined to his bed three days following the accident and had been treated by Dr. Davidson ever since. His complaint was of a nervous condition and insomnia; headaches all the time, sometimes becoming severe; pains in the region of the heart, which were intermittent; a general weakness and impairment of vision. The doctor found his blood pressure normal, and no disease or impairment, as far as he could discover, of any of his organs. He said he did not think there was any permanent disability; that the effects of an electric shock are immediate and not remote. He testified the symptoms Miller complained of might be the result of influenza. He further testified he believed Miller had hystero-neurasthenia, which he said is a common result of an electric condition. It incapacitates a man from work while it lasts and sometimes is never cured. That condition might result from influenza. Miller again testi-

fied and said he had been in bed a good deal of the time since the hearing before the arbitrator; that his nervous condition was worse; that he had a pain in the region of the heart, headaches all the time, and was unable to do any physical work.

On the hearing before the commission after the cause was remanded, Miller testified he was weak and unable to work, short of breath, nervous, could not control himself, and had not the strength to perform labor. He tried to work in a restaurant and after five days had to quit and go to bed. Later he worked five weeks in the post-office, got sick, had a nervous breakdown and had to quit work. He testified he was weaker than he was at the time of the hearing before the arbitrator. Dr. Davidson, his family physician, testified he had treated Miller as often as once a week since June, 1922; that he was easily fatigued, had lost weight, his nervous system was affected, had a rapid pulse, low blood pressure, general weakness and great debility. The doctor expressed the opinion Miller's physical condition was such that he could not perform labor and that the condition was permanent. He could detect no other pathological condition, and attributed the condition of Miller to the electric shock. He said if he had not had the history of the accident he would have been unable to determine the cause of Miller's condition. He depended on the history of the accident and the symptoms of Miller's condition. One could not have a nervous condition without something to cause it, and the doctor could find no other pathological condition to attribute the trouble to, and believed it due to the accident. He never examined Miller's teeth or tonsils. He said Miller did not have the flu and he never treated him for that disease though he had been his family physician for six years. Dr. Magnuson had examined Miller and received from him a complete history of his accident and his condition afterwards. Miller's teeth were in bad condition and showed considerable amount of

dental work. The doctor said there was a tremendous systolic murmur in the heart, which was enlarged to the left, otherwise he found no particular trouble. His blood pressure was about normal. The doctor said the effects of an electric shock are immediate and not remote. A person shocked would get over it within a reasonable length of time. Influenza is the result of infection and very likely to affect the heart and heart muscles. The conditions he found in Miller he said could be the result of influenza. His examination was made September 23, 1923. Dr. Kane, a dentist, testified he had done work for Miller; that he had removed two molar teeth in the upper jaw and two roots in the lower. He did not seem to have any soreness of the teeth, but the roots were very small. The symptoms did not indicate there was any pus around the roots, but the doctor made no X-ray examination.

The award was made for permanent partial disability. We have repeatedly held that in an application for compensation the claimant must prove his case by the greater weight of the evidence, and that the rule in that respect is the same as in a common law action. The evidence in this record shows Miller received a shock from a cable carrying a high voltage electrical alternating current, which was sufficient to render him dazed or unconscious for a brief period. The weight of the testimony preponderates, we think, in favor of the proposition that the shock from such a current is immediate and not remote, but the testimony also shows that such a shock produces an immediate effect upon the nervous system, the heart, blood and eyes, but in an ordinary case of such shock no permanent effects will remain where the patient survives it. Dr. Moore, for plaintiff in error, testified a man might have resultant hysteria from a shock which left no visible physical signs but would disable a man as absolutely as a physical impediment. He said that was the worst kind of a case industrial surgery had to contend with. He testified he found nothing in

his examination of Miller to indicate he was malingering. Dr. Hick also testified he found nothing to indicate Miller was a malingerer. Dr. Roberts testified he thought Miller's condition was that of hystero-neurasthenia, which he said was a common result of an electric shock; that a man doesn't work when he gets hysteria; that it incapacitates him as long as it lasts. The weight of the evidence, we think, shows Miller's condition to be such that he cannot perform manual labor. Dr. Magnuson testified there was "a tremendous systolic murmur in the heart which can be heard all over the heart area." He said the heart was enlarged and Miller was very short of breath; that his heart muscle was weak. Before receiving the shock Miller's physical condition was good, according to his testimony, which was not disputed. The testimony shows it is not good now and has never been since he received the shock. There was medical expert testimony that while the effects of an electric shock are immediate, hystero-neurasthenia is a common result of such an accident and will disable a man as completely as a physical impediment. The evidence warrants the conclusion that Miller is suffering from some trouble which incapacitates him, or at least partially incapacitates him, for physical labor. The question then arises whether he is entitled to an award if he is suffering from hysteria due to the electric shock, which incapacitates him for work.

Before the accident Miller's physical condition was good. It is not so now. It is not claimed he received any other accidental injury than the electric shock. We are warranted in concluding from the evidence that if the accident did not directly produce the effects complained of by Miller, the shock to his system produced in his mind the conviction that his health and physical vigor were destroyed, resulting in hystero-neurasthenia and incapacity to work. The case considered by the court in *United States Fuel Co.* v. *Industrial Com.* 313 Ill. 590, was that of an employee who had received an injury to the spine in the lumbar region, causing

a fracture. He was treated for the injury in a hospital but never performed any more work and continually walked in a very stooped position. He claimed he could not straighten up. Several doctors testified X-ray pictures showed the injury to his spine had healed and there was no pathological condition to account for his stooped position. Some of the medical witnesses testified they believed the claimant's condition was mental rather than physical. One doctor said he was a hystero-neurasthenic; that in the opinion of the witness claimant thought he could not straighten up; that he was incapacitated for work and would remain so until his mental condition was cured. The court said: "The evidence in the record as above detailed supports the finding of the Industrial Commission that the defendant in error suffered an accident which has caused total and permanent incapacity for work. It is immaterial whether this condition is caused by a physical injury or a mental disorder resulting from the injury. Where an employee has an honest, fixed, definite and continuing belief that he is suffering severe bodily pain, and that he is in such a disordered condition that he is unable to work and walks in a very stooped position, as does defendant in error, and all of the foregoing conditions have been brought about by a severe accidental injury, he is as much entitled to compensation as if he were in fact totally and permanently disabled by such accidental injury. * * * Such mental disease or disorder may not only render the subject thereof totally disabled for work but such condition may also be permanent. The record evidence in this case supports the finding that the disorder, of whatever character it may be, mental or physical, has rendered the defendant in error totally and permanently incapacitated for work." It does not appear to us the present case can be distinguished from that case.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*