(No. 42642.—

INTERNATIONAL HARVESTER COMPANY, Appellant, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(EDWARD H. HOEKENDORF, Appellee.)

*Opinion filed September 29, 1970.*

GIFFORD, RODDY, POWER & DETUNO, of Chicago, for appellant.

FRANK S. KANELOS and JOHN SULLIVAN, both of Chicago, (CHARLES WOLFF, of counsel,) for appellee.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Edward Hoekendorf was awarded workmen's compensation benefits for permanent total disability, plus certain medical expenses, due to a condition of traumatic neurosis attributed to an accident occurring on March 1, 1961. The employer, International Harvester Company, appeals, following affirmance of the arbitrator's award by the Industrial Commission and the circuit court of Cook County. The company does not dispute that Hoekendorf sustained a compensable injury in the 1961 accident, nor is the fact of present disability challenged; the company's primary contention is that claimant's disability is due to an independent intervening cause. A subsidiary question relates to reimbursement for medical payments by claimant to his own physician.

In the accident, Hoekendorf was struck on the head by a heavy tractor part dropped by a fellow employee. He was attended by a company doctor, who applied ice packs to reduce the swelling. That evening, he suffered from dizziness, with sharp pains and a burning feeling on his head. He worked the next week-and-a-half, with the same symptoms, seeing the company doctors several times. On the 10th of March, he felt faint at work and was taken by ambulance to the dispensary, which was ½ mile away. He stayed home on Monday, the 13th, and saw Dr. Micaletti, his own doctor. He saw Dr. Slive, the company's chief physician, the next day, and was instructed to enter the hospital, which he did on March 15. He remained in the hospital until April 3; the hospital records included as the "primary observation" the notation, "observation following minor head injury, obsessive compulsive behavior disorder." Dr. Mackay, who attended claimant, confirmed the diagnosis at the time of discharge from the hospital.

Hoekendorf remained at home until June 14, 1961, seeing the company doctors several times, and Dr. Micaletti twice. When he returned to work, he still suffered from a burning feeling, a feeling of numbness, headaches, dizziness, and the sensation of bugs crawling upon his head and face. The symptoms persisted over the next year, during which time he saw both Dr. Micaletti and Dr. Slive on several occasions. In February, of 1962, as Hoekendorf returned to work after being off about a week, Dr. Slive noted "psychotic manifestations." Claimant was off work again in October of 1962, and Dr. Slive diagnosed "psychotic disorder—paranoid reaction. Complains of weakness, dizziness, pain and headache, sensation of 'bugs crawling' on the scalp and burning sensation of scalp. * * * No objective abnormalities." When he returned to work, he was disapproved by the medical department for a position as driver of a hoist truck, due to his "history of cerebral contusion with occasional headaches." Over a period of the next 2½

years he reported to the dispensary only a few times with headaches or weakness and missed only a few days from work. However, he continued to see Dr. Micaletti on a monthly basis, and his symptoms persisted.

In March of 1965, Hoekendorf's wife suffered a breakdown which required medical care and subsequent commitment; she apparently flailed about, striking claimant around the eye. Severe swelling and pain developed, and Hoekendorf was off work for a month. When he returned, he was placed in a job which required climbing about on tractor frames and bending down. He told the foreman that he still had dizzy spells, and the foreman rejected him for the job, suggesting that Dr. Slive would have to see him and then perhaps the union could find something else for him to do. When Dr. Slive saw claimant a week later, he noted "marked mental changes", and decided there was no job suitable for him. It is agreed that he has been totally disabled since that time with a traumatic neurosis; the dispute centers on the cause of the neurosis. The claimant contends that the 1961 accident caused the symptoms which have persisted and have rendered him totally disabled since then, while the employer argues that he had recovered completely from the effects of that accident and now suffers from the effects of the 1965 incident.

The medical testimony conflicted as to Hoekendorf's condition prior to 1965, and as to the cause of present disability. Dr. Micaletti had treated claimant regularly since 1961, and testified that between 1961 and 1965, "his complaints were causing disability, but in spite of that the patient was trying to work." Explaining the basis for his opinion that claimant was presently unable to work, Dr. Micaletti stated, "The basis are on the findings, subjective findings and the composite picture of seeing Mr. Hoekendorf over a period of five years where he continues to complain of head pain and bug-crawling feeling in the head, pressure in the head, visual disturbances and complaints, symptoms

or complaints as mentioned before which—which are still present of course." Dr. Jackman, a specialist in neurology and psychiatry, had examined Hoekendorf three times in 1963, confirming the diagnosis of traumatic neurosis at that time. His analysis of claimant's condition as of 1963 was that "He is extremely anxious and tense, and I feel that he has suffered quite a severe degree of emotional damage as a result of the accident. This is the result of threat to life that occurred at the time, which apparently caused tremendous impression on him. He has a great deal of conversion symptoms and should be treated for the neurosis aside from the organic features." He felt that Hoekendorf "was really not employable" in 1963. He agreed that the 1965 incident could aggravate a neurosis; but when asked to assume that the symptoms before and after the incident were essentially the same, he said that the incident would have no significance.

Dr. Slive felt that Hoekendorf was only disabled for a few months by the accident in 1961. "The patient in my opinion was disabled from work between March the 1st and June the 12th, 1961, because of an emotional disorder, and was certainly able to return to work and did after June the 12th, 1961." He stated that a person might have a psychotic disorder which is not disabling until aggravated. Upon Hoekendorf's return to work following the 1965 incident, he noted "marked mental changes" and diagnosed "psychotic disorder" with "nervous complaints, mind goes blank, dizziness, weakness of legs, burning and squeezing sensation in head. There is no job available at Tractor Works he can possibly perform." He explained the basis for his finding of marked mental changes. "I meant in comparison with the previous examinations the patient appeared—the patient's mental condition appeared worse to me. He appeared more nervous, more tense, more emotionally disturbed, more bizarre complaints, dizziness on leaning over. This was a new sort of symptom. His whole emotional—

his whole emotional makeup seemed deteriorated." Dr. Schlan, a specialist in neuropsychiatry, examined claimant in March of 1966. He found that Hoekendorf "has suffered from and continues to suffer from a personality pattern and disturbance which was intensified by his injury in 1961. However, emotional trauma in 1965 resulted in his present functional responses which disabled him." In answer to a hypothetical question incorporating *inter alia* claimant's work record and the findings of Doctors Micaletti and Jackman, Dr. Schlan answered "There is no relationship between the alleged injury to the hypothetical man in '61 and the disability in '65." He explained that "The condition here is one of an obsessive compulsive neurosis and personality disorder. In this hypothetical case the incident in 1961 set off a series of clinical incidents which in turn resolved. So that the individual then was functionally well in '63 and '64, losing only negligible numbers of days until '65, at which time a separate emotional trauma existed, social, that is, which then created the disability of 1965."

The employer contends that Hoekendorf's own complaints after 1965 reveal that his condition did change as a result of the incident at home, and that his incapacity for work is directly due to that change in his condition. In March of 1966, Hoekendorf told Dr. Schlan that "I want to go back to work,. but I have to get a job where there is no bending, so I have to get a job sitting, but even sitting is no good; sitting, walking, standing, is all the same." He testified before the Commission in 1968 at the hearing on review, and stated, "I get dizzy spells. I walk and topple over and I stand and topple over. * * * When I speak I have wrong words and my sentences and words skip when I speak. * * * My right jaw bone goes out of place at times when I chew or speak. * * * I get vision, my vision, I see reddish lines about 6 to 8 inches long. * * * My mind goes blank for awhile. I don't know how long, and whatever I do at a time when my mind goes blank, I don't

know. * * *. I get weak. I still get weak like I am going to faint at times no matter where I am at."

The conflict in the medical testimony is clear, and evaluation of the facts in such a case is peculiarly within the province of the Industrial Commission. As we have repeatedly said, the Commission's findings on the issue of medical causation will not be disturbed on review unless contrary to the manifest weight of the evidence. (*Proctor Community Hospital* v. *Industrial Com.*, 41 Ill.2d 537, 541.) While Hoekendorf did return to work for several years following the work-related injury, this fact alone does not establish that he had recovered from that accident. (*Jewel Tea Co.* v. *Industrial Com.*, 39 Ill.2d 180; *City of Collinsville* v. *Industrial Com.*, 36 Ill.2d 425; *Grey* v. *Industrial Com.*, 35 Ill.2d 462; *cf. Bethlehem Steel Corp.* v. *Industrial Com.*, 41 Ill.2d 40.) Claimant argues that there was sufficient medical testimony from which the Commission could find that Hoekendorf was totally disabled throughout the period between 1961 and 1965 due to a condition caused by the accident at work, and that he remained totally disabled as a consequence of that accident alone.

The employer urges that claimant had recovered from his 1961 disability and that recovery is manifested by the fact that claimant performed his work satisfactorily for at least two years preceding 1965. The case of *Bunge Brothers Coal Co.* v. *Industrial Com.*, 306 Ill. 582, is cited as authority that an employee can recover only for a disability caused entirely by the accident occurring in his employment, and the employer is not responsible for any degree of disability attributable to an independent cause intervening after the original accident. In the *Bunge Brothers* case, the employee suffered from a venereal disease which flared up some months after his injury and aggravated his condition. This court remanded the case for determination of the portion of disability resulting solely from the accident. A subsequent decision cited the *Bunge Brothers* case, and reversed

an award where disability from pneumonia was not medically related to the employee's work injury, but rather stemmed from a cold bath taken over three weeks later. (*Perry County Coal Corp.* v. *Industrial Com.*, 311 Ill. 266.) Notwithstanding the "rule" derived from the *Bunge Brothers* case, the Illinois law relating to medical causation and the "independent intervening cause" is unclear. Specifically, it appears unclear whether full compensation for a condition of disability may rest on a showing that the work-related accident was a contributing factor without which the disability would not have occurred, or only upon a showing that the accident was the sole cause of disability.

An "independent intervening cause" has been held to be one which breaks the chain of causation between a work-related injury and an ensuing disability or injury. (*Shell Oil Co.* v. *Industrial Com.*, 2 Ill.2d 590, 595.) Where the work injury itself causes a subsequent injury, however, the chain of causation is not broken. (*Harper* v. *Industrial Com.*, 24 Ill.2d 103, 108.) In this context, the cases have applied a "but for" test, basing compensability for an ultimate injury or disability upon a finding that it was caused by an *event* which would not have occurred had it not been for the original injury. (See *Harper* v. *Industrial Com.*, 24 Ill.2d 103, 108; *Shell Oil Co.* v. *Industrial Com.*, 2 Ill.2d 590, 595.) Clear illustrations of this chain of causation relationship are cases where a second injury occurs due to treatment for the first (*Shell Oil Co.* v. *Industrial Com.*, 2 Ill.2d 590; *Lincoln Park Coal and Brick Co.* v. *Industrial Com.*, 317 Ill. 302,) or where a suicidal act is caused by the effects of an original injury. (*Harper* v. *Industrial Com.*, 24 Ill.2d 103.) The "but for" rationale has also been extended to cases where the event immediately causing the second injury was not itself caused by the first injury, yet but for the first injury, the second event would not have been injurious. Thus a broken leg may be a compensable injury where it breaks upon stepping out of bed or off a

curb, if the break is due to bone weakness caused by the original injury. (*Hammond Co.* v. *Industrial Com.*, 288 Ill. 262; *Bailey* v. *Industrial Com.*, 286 Ill. 623.) The injury, followed by infection and amputation of a finger, has been found to have lowered claimant's resistance to tubercle bacilli which caused death, and the causal connection sustained an award of death benefits. *Chicago, Wilmington & Franklin Coal Co.* v. *Industrial Com.*, 400 Ill. 60.

A somewhat similar application of the "but for" rationale is made in heart attack cases, where the causal connection between employment activity and an ensuing injury—the heart attack—is at issue. "To come within the statute the employee must prove that some act or phase of the employment was a causative factor in the ensuing injury. He need not prove it was the sole causative factor nor even that it was the principal causative factor, but only that it was *a* causative factor in the resulting injury." (*Republic Steel Corp.* v. *Industrial Com.*, 26 Ill.2d 32, 45.) This "a causative factor" test has been applied as well to the causal connection between a compensable injury and a subsequent heart attack (*Proctor Community Hosp.* v. *Industrial Com.*, 41 Ill.2d 537; see also *Gudeman Co.* v. *Industrial Com.*, 399 Ill. 279), and has been alluded to as the proper test of causal connection between a compensable injury and ensuing disability in a nonheart case. *A. O. Smith Corp.* v. *Industrial Com.*, 33 Ill.2d 510, 513.

The "but for" or "a causative factor" test has thus been employed in a variety of instances as the measure of causal connection between compensable injuries and subsequent injuries and disabilities. While other language has been used in many cases (see, *e.g.*, "proximate cause", *Boland* v. *Industrial Com.*, 34 Ill.2d 422, 423, *American Smelting and Refining Co.* v. *Industrial Com.*, 353 Ill. 324, 328, *Harrisburg Coal Mining Co.* v. *Industrial Com.*, 315 Ill. 377, 378; "causal connection", *Livingston Service Co.* v. *Industrial Com.*, 42 Ill.2d 313, 317-18, *Gudeman Co.* v.

*Industrial Com.*, 399 Ill. 279, 280; "directly traceable", *Shell Oil Co.* v. *Industrial Com.*, 2 Ill.2d 590, 595; "results from", *Douglass and Co.* v. *Industrial Com.*, 35 Ill.2d 100, 104; "arising out of", *Postal Telegraph Cable Co.* v. *Industrial Com.*, 345 Ill. 349, 352), and some cases do not articulate any standard, we believe that the rationale of the "a causative factor" test has been generally applied. Thus, if a nonemployment-related factor is a contributing cause, with the compensable injury, in an ensuing injury or disability, it does not constitute an "independent intervening cause" breaking the causal connection where it is not brought about by claimant's intentional or negligent misconduct. (See 1 Larson, Workmen's Compensation Law (1968 ed.) § 13.00 *et seq.*) This proposition squares with a reasonable interpretation of the *Bunge Brothers* case, where the unrelated causative factor was apparently the sole cause of claimant's disability. To the extent the case suggests that compensation must be apportioned to cover only the proportion of a single disability deemed to be due solely to the work injury, where another factor has aggravated the condition without claimant's fault, we disapprove of the case.

In our judgment compensation for subsequent injury or disability is properly awardable whenever, but only whenever, the existing employment-connected condition is a causative factor in producing either the subsequent injury or the subsequent disability. In this case the Commission could reasonably infer from the testimony before it that claimant was suffering from a continuing condition of traumatic neurosis resulting from the 1961 accident, and that the existence of this condition was a causative factor in the total and permanent disability following the 1965 injury.

An additional point requires consideration: Hoekendorf was awarded $235 for medical expenses incurred in visits to his own physician, Dr. Micaletti, beginning March 13, 1961. The only evidence upon which it can be found that claim-

ant became entitled to procure treatment on his own at the employer's expense was a remark made to claimant by one of employer's physicians, on October 23, 1961, to the effect that he could do nothing more to help claimant. Hoekendorf's privately incurred medical expenses prior to that remark are thus improperly included in the award.

The judgment of the circuit court of Cook County affirming the award for total permanent disability is affirmed; the award of medical expenses is modified to exclude the $235 nonreimbursable medical expenses and, as so modified, the judgment is affirmed.

*Judgment affirmed as modified.*