EVA McDANIEL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (The County of Cook, Appellee).

First District (Industrial Commission Division) No. 1—89—1425WC

Opinion filed April 27, 1990.—Rehearing denied June 6, 1990.

Wittenberg & Dougherty, Ltd., of Chicago (David M. Wittenberg, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Joan S. Cherry, Myra J. Brown, and LaBrenda E. White, Assistant State's Attorneys, of counsel), for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The claimant, Eva McDaniel, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*) for an injury to her knee which she sustained during the course of her employment with the respondent, Oak Forest Hospital. (We note that there is no evidence presented in the record of the relationship of Oak Forest Hospital to the County of Cook; however, we presume that Oak Forest Hospital is a county hospital, and therefore, any reference to the "respondent" shall be understood to mean both Oak Forest Hospital and County of Cook.) At the hearing before the arbitrator, the claimant presented medical evidence of her knee injury and of her psychological condition. Ultimately, the arbitrator found that the claimant's knee injury arose out of and in the course of her employment, and awarded her temporary total disability (TTD) for 30⁶/₇ weeks, her related medical expenses for her knee, and permanent partial disability (PPD) for a 10% loss of the use of her left leg. The arbitrator also held that the claimant had failed to prove there was a causal connection between her current mental condition and her work accident of December 24, 1980, and denied her benefits for her mental disability.

On appeal to the Industrial Commission (Commission), the Commission modified the arbitrator's decision by increasing the claimant's PPD from a 10% to 15% loss of the use of her left leg and by entering the specific dollar amount of the medical expenses that the claimant was entitled to receive for her left knee injury, but in all other respects, the Commission affirmed the arbitrator's decision. Subsequently, the circuit court of Cook County confirmed the Industrial Commission's decision, and the claimant appeals. On appeal, the sole issue raised by the claimant is whether the Industrial Commission's determination that the claimant failed to prove there was a causal connection between her psychological disability and her work-related accident was against the manifest weight of the evidence.

Two hearings in which testimony was presented were held before the arbitrator. The first hearing was held on February 27, 1985, and the second hearing was conducted on April 24, 1985. At the first hearing, the claimant testified that she was employed in the dietary department of the respondent on December 24, 1980. Her duties consisted of fixing trays for patients, loading the trays onto a motorized cart, pushing the cart full of trays to the ward, distributing the food trays to the patients, and collecting the trays after the patients had eaten. The motorized cart used in these tasks carried approximately 30 trays of food.

On December 24, 1980, the claimant was operating her motorized cart when the cart hit her and pinned her left knee against the wall. This accident occurred at about 2:15 p.m., 15 minutes prior to the end of the claimant's work shift. The claimant reported her accident, but because her workday was nearing the end, she did not go to the respondent's Employee's Health Services until the following day. At that time, her knee was examined, and subsequently, the claimant's left leg was placed in a cast which came to mid-thigh. When her cast was removed, she received physical therapy for her knee.

In addition to her treatment from the respondent's services, the claimant also saw Dr. Haskell, whom the claimant described as a "bone specialist." She first saw Dr. Haskell in February of 1981, and she continued to see Dr. Haskell once a month until July of 1981. Dr. Haskell diagnosed her condition as torn ligaments of the left knee and knee sprain. On May 1, 1981, Dr. Haskell hospitalized the claimant at Michael Reese Hospital for what the claimant termed a "blood clot" in her left leg. She was discharged on May 7, 1981. After her discharge, the claimant saw Dr. Haskell for the last time on July 7, 1981. At her last visit, Dr. Haskell told the claimant she would always have problems with her knee, but that further treatment was unnecessary.

The claimant testified that prior to her accident, the claimant was a "busy" person, and in addition to her working, she bowled, kept house, and socialized. After her accident, she visited with her friends, watched television, and tried to do her housework. When the claimant was released from Michael Reese Hospital, her knee bothered her, she sometimes had trouble with her back, and she "felt anxious to go back to work." Additionally, she was unable to keep busy all day long, which made her feel irritable, tense and nervous, and sitting around made her feel depressed.

Subsequently, on May 24, 1981, the claimant was admitted to Our Lady of Mercy Hospital for what the claimant termed was a "nervous breakdown." During her stay at the hospital, the claimant was treated by Dr. Frieske. She was discharged from Our Lady of Mercy on June 22, 1981.

The claimant further testified that she did not work after her accident of December 24, 1980, until she returned to her employment in the dietary department on August 29, 1981. Upon her return to work, she felt tired and weak, and she could not stand very long because her knee bothered her; however, she was feeling good psychologically. When the claimant returned to work, her work duties had changed and she did "assembly line" work, wherein the claimant did different tasks from day to day. According to the claimant, her new work tasks

required more of her physically than before since she had to stand and "push and pull things" more often. She attempted to do the work, but the new work detail made her "feel bad" because she could not keep up the pace.

The claimant worked from August 29, 1981, until April 17, 1982. During that time, the claimant found the work to be a strain physically on her, and made her feel nervous, and "like I couldn't hold up during eight-hour pressure." Subsequently, on April 20, 1982, Dr. Frieske admitted the claimant to Southlake Mental Health Center (Southlake). Dr. Kim, Dr. Frieske's associate, who treated her while she was in the hospital, placed the claimant on medication at this time. The claimant was discharged on April 28, 1982.

Subsequent to her hospitalization on April 20, 1982, the claimant had numerous other hospitalizations for her mental condition. The claimant testified that she was hospitalized on the following dates in the following hospitals for her psychological problems: September 25, 1982, to October 1, 1982, at Our Lady of Mercy Hospital; December 22, 1982, to January 1, 1983, at Our Lady of Mercy Hospital; March 3, 1983, to March 14, 1983, at Tinley Park Mental Health Center (Tinley Park); and on September 10, 1984, to September 27, 1984, at Christ Hospital. In addition to her hospitalizations, the claimant received outpatient treatment from Family Service and Mental Health Center of South Cook County (Family Services) commencing on June 10, 1983. When she was in Our Lady of Mercy Hospital, the claimant was treated by Dr. Frieske and Dr. Kim, but when she was treated as an out-patient with Family Services and was hospitalized at Christ Hospital, she was treated by Dr. Vivar. The claimant had continued her therapy with Family Services and was still being treated by Dr. Vivar. The claimant stated that since her hospitalization of April 20, 1982, she had not been released for work by a psychiatrist, and she remained on a leave of absence from her employment.

The claimant had worked for the respondent in the dietary department since 1967. Prior to her accident on December 24, 1980, the claimant had two other injuries to her lower back while at work, one on April 20, 1979, and one on March 22, 1980. The claimant filed workers' compensation claims and received compensation for these two previous accidents. After her back injuries, the claimant returned to the same work duties as before her injuries.

According to the claimant, before her accident of December 24, 1980, she had never received treatment for a psychological problem. She admitted that the records of Our Lady of Mercy Hospital indicated that her mother suffered from mental illness. The claimant

stated that she and her husband had not had any marital difficulties prior to her accident, but a couple of years after her accident of December 24, 1980, she and her husband separated. At the time of this hearing, she and her husband were reunited and had been back together for the past year and a half.

The claimant testified that she continued to feel nervous and that she was on medication. Dr. Vivar had prescribed lithium, Prolixin and Cogentin for her. The claimant stated that she does not have her strength back, either physically or mentally. Since April of 1982, the claimant has not been as active as she likes to be, which upsets her. With regard to her left knee, the claimant admitted that she does not use crutches, a cane or a brace for walking; she takes Tylenol for her pain; and she has not received any medical treatment for her knee injury since 1981. At her attorney's request, the claimant saw Dr. Garron in July 1984, and at the respondent's request, she saw Dr. Scuderi and Dr. Blackman at that time.

The claimant stated that she had graduated from high school. She further stated that since April 1982, she had looked for lighter work. Her efforts to seek other employment consisted of applying for a job as a transporter at Ingalls Hospital and as a security guard.

The claimant's husband, Darnell McDaniel, testified that he and the claimant had been married for 16 years. During their marriage, the claimant worked full time until her accident of December 24, 1980. Darnell described his wife as a very active person who always worked, kept house and was "on top of things." He stated she was a happy individual, and that the claimant had a strong constitution.

After the claimant's injury of December 24, 1980, Darnell noted that the claimant was not as busy as she used to be. Additionally, the claimant's attitude also changed. When the claimant went back to work in August of 1981, the claimant did not sleep well, she would get up in the middle of the night, and she worried considerably. The claimant also complained about her legs and limped around the house.

Darnell admitted that the claimant had started to change before her accident of December 24, 1980. The claimant had been off work for her back injuries prior to the accident in December, and it was then he first began to notice a difference in her. In Darnell's opinion, the claimant's mental outlook was influenced by how busy she was or was not.

Darnell denied that he and the claimant had marital difficulties prior to December 24, 1980. However, he admitted that he and the claimant had separated in 1983 for approximately two years. He corroborated the claimant's testimony that they were now reunited.

No other testimony was presented at this hearing, but numerous medical records of the claimant were introduced into evidence. The medical records of Oak Forest Hospital indicated that the claimant was seen for her knee injury on December 26, 1980, and was found to have echymosis (essentially a bruise) of the left knee. On December 29, 1980, the claimant saw an orthopedist at Oak Forest Hospital, and a leg cast was applied. The X-ray examination done on the claimant's left knee at Oak Forest Hospital revealed that the claimant had no evidence of a fracture, a dislocation or a gross bone abnormality of her left knee. Ultimately, the claimant was diagnosed as having a partial tear of the lateral collateral ligament of her left knee.

Dr. Vittel's notes of April 27, 1981, from Oak Forest Hospital, indicated that the claimant had superficial thrombophlebitis (inflammation of the wall of a vein and the formation of clots) in her left leg, which was confirmed in Dr. Gaffud's consultation report. Subsequently, the claimant's medical records confirmed that she was admitted to Michael Reese Hospital by Dr. Haskell for treatment of the superficial thrombophlebitis on May 1, 1981, and was discharged from there on May 7, 1981. On June 21, 1981, the claimant was released to return to work orthopedically by Oak Forest Hospital, but the record indicated that she also needed clearance with regard to the thrombophlebitis. On July 27, 1981, the claimant was found to have full range of motion in her left knee, that she had no instability in standing, that she was able to squat well, and that she was able to return to work.

The medical records of the claimant's hospitalization at Our Lady of Mercy Hospital on May 24, 1981, were admitted. These records indicated that Dr. Frieske was her attending physician. The claimant's discharge summary gave her diagnosis as "[a]cute agitated depression." The reason given for her admittance was that the claimant attempted to set fire to her home, whereupon her husband brought her to the hospital, and she was involuntarily committed. In the claimant's history and physical report it was stated that she was admitted "because of bizarre and disorganized behavior over the past two weeks," and her behavior was described as fluctuating, i.e., "very severe disturbance interspersed with feeling fairly good." The claimant's history revealed that her mother had had psychiatric treatments, was on medication, and had been hospitalized for mental problems in the past. Dr. Frieske reported that the claimant had recently been drinking heavily.

The psychosocial history report of the claimant of June 8, 1981, prepared by Jesse Munoz, a social worker, stated that according to the claimant's husband, the claimant had always found it necessary to

keep busy or she would become "hyper." The claimant's husband reported to Munoz that the claimant had not worked since her accident to her knee, and that the claimant had been on "pain killers." The claimant's husband had noted that the claimant had been becoming gradually overactive, which immediately preceded the claimant's psychotic behavior. Munoz described the claimant, from the information he had received of her, as compulsive and obsessive, and he noted that she had difficulty tolerating inactivity. Munoz' report stated that in addition to the claimant's use of pain killers since January, she had also been drinking during this time.

The claimant was discharged from Our Lady of Mercy Hospital on June 22, 1981. On August 8, 1981, Dr. Frieske released the claimant for work as of August 10, 1981. The records also indicated that after her hospitalization for her mental problems the claimant was placed on the following medications: lithium, Navane, Cogentin and Benalyn expectorant.

The claimant's discharge summary of her hospitalization at Southlake revealed that the claimant had been hospitalized there from April 20, 1982, through May 4, 1982. The final diagnosis of the claimant's condition at that time was given as "major affective disorder (depression)." The claimant was admitted on the recommendation of Dr. Frieske, because she was nervous, tense and depressed. The records of this hospitalization stated that the claimant "felt unable to cope with her responsibilities, especially at work. Her mother has also been a problem[,] currently under psychiatric treatment, but doing fairly well." It was noted that the claimant had been on lithium and Navane in the past because of her high level of excitement. At the time of the claimant's discharge on May 4, 1982, Dr. Frieske completed a disability form for the claimant, where he indicated by checking a box on the form that the claimant's sickness arose out of the claimant's employment.

A consultation report done on May 24, 1982, by Dr. Sherman Kaplitz, at Dr. Vittel's request, indicated that Dr. Kaplitz had contacted Dr. Frieske with regard to the disability form completed by Dr. Frieske on May 4, 1982. Dr. Kaplitz reported that Dr. Frieske did not recall stating that the claimant's depression was work related. Dr. Kaplitz went on to state that, at the present time, he did not find evidence that the claimant had a true major depression, but he felt that her depression was reactive, and that the claimant was reacting in this manner to avoid returning to work. He believed that the claimant would benefit by returning to work as soon as possible. An orthopedic progress note of this same date, submitted to Dr. Vittel, stated that

the claimant's knee was not swollen and that she had full range of motion, and that the claimant was orthopedically able to return to work.

Another discharge summary disclosed that the claimant was again hospitalized at Our Lady of Mercy Hospital from July 8, 1982, through September 2, 1982. The diagnosis of her condition at this time was "acute paranoid disorder." She was admitted to the hospital for "violent acting out, behaving strangely, and [because she] had been trying to burn her own house." The claimant was brought to the hospital by her husband, and at the time of her admittance, the claimant was belligerent and combative. This record also stated that the claimant's mother suffered from mental illness.

The claimant's next hospitalization was from September 25,1982, until October 1, 1982, at Our Lady of Mercy Hospital. The diagnosis of the claimant's condition given in the discharge summary of this hospitalization was "acute paranoid disorder." The claimant was admitted on this occasion for depression, difficulty in sleeping, increasing agitation, wandering around at night, and paranoia against her husband. The report noted that the precipitating event for this hospitalization was that the claimant's husband recently filed for a divorce. It was also noted that the claimant had stopped taking her medication.

The claimant was again hospitalized at Our Lady of Mercy Hospital on December 22, 1982, and was discharged on January 1, 1983. The diagnosis of the claimant's condition in the discharge summary of this hospitalization was "residual schizophrenia with acute exacerbation." The claimant was hospitalized because of confusion, wandering away from home, trouble sleeping, and exposing herself to people by disrobing. The claimant left the hospital on an overnight pass and failed to return; therefore, she was discharged.

The medical records of Tinley Park disclosed that the claimant was admitted there on March 3, 1983, and was discharged on March 14, 1983. The claimant was diagnosed as having "[s]chizophrenia, undifferentiated type, chronic." The discharge summary from Tinley Park stated that the claimant was currently separated from her husband. The claimant had been brought to Tinley Park by the Harvey police on a writ of detention because the claimant had been physically aggressive, hostile, and easily agitated. Additionally, she had been exhibiting bizarre behavior, wherein she had removed food from the refrigerator and had covered it with sheets, and she had walked around the house nude and had attempted to leave the house naked. It was noted that the claimant had not been taking her medication for the

past three months.

The records of the claimant's outpatient treatment with Family Services, which commenced on June 10, 1983, revealed that the claimant's mother was also an aftercare patient. The records reported that the claimant had been stressed for the past year because of her unemployment. The claimant was found to be confused and evasive when she was questioned about her history of psychiatric hospitalizations, but she spoke often of her knee injury. The records noted that the claimant "state[d] symptoms [of her mental illness] began after knee injury but evasiveness suggests possibility of prior difficulty." The Family Services records indicated that the claimant stated that she "can't talk to mother who 'keeps things in,' " and that the claimant's mother had atypical psychosis since 1977. It was stated in the records that the claimant was separated from her husband, that she had a son 16 years of age, and that the claimant said she was "not going back to no bad marriage." The records from Family Services indicated that the claimant had conflicts with her parents and her "abusive" husband. In her treatment at Family Services, the claimant was under the care of Dr. Vivar.

The notes of Family Services dated October 4, 1984, indicated that the claimant was now living with her husband, but that she was having problems with this. Additionally, it was noted that the claimant was also having difficulty with her son, who had been picked up for shoplifting; that she had her lawsuit for her work injury pending; and that she had conflicts with her husband, which was making her depressed.

On September 10, 1984, the claimant was again hospitalized at Christ Hospital under Dr. Vivar's care. The claimant was diagnosed as having a "[s]chizophrenic disorder." The claimant's problems, upon her admission, were depression and thought process disorders including hallucinations, delusions, thought blocking, and confusion. The records of Christ Hospital revealed that the claimant was still separated from her husband, and that she had been separated from him for the past year and a half to two years. The claimant was discharged from Christ Hospital on September 27, 1984.

Lastly, Dr. Garron's psychological evaluation report of the claimant of July 14, 1984, was admitted. Dr. Garron's report stated that in addition to his clinical interview with the claimant, he had also administered the following psychological tests to the claimant: Peabody Picture Vocabulary Test-Revised Form L; Thematic Apperception Test; and Rorschach Test. The results of the psychological testing did not presently indicate a schizophrenic, major affective, paranoid, anxiety,

somatoform, or dysthymic disorder. However, he noted that the claimant had several characteristic traits of "Atypical or Other Personality Disorders," specifically an Inadequate Personality Disorder. Dr. Garron stated that "[i]n view of these specific characteristics, it is likely that any stress causing anxiety, or even unusual excitement, may result in personal disorganization." Dr. Garron thought it possible that the claimant's injury of December 24, 1980, or her extended period of time away from work, had contributed to her decompensation. This concluded the evidence presented at the February hearing before the arbitrator.

At the second hearing before the arbitrator on April 24, 1985, the testimony of two psychiatrists was presented. The claimant's psychiatrist, Dr. Marvin Ziporyn, testified that he had reviewed the claimant's testimony at the previous hearing before the arbitrator, and the claimant's attorney's abstract of the claimant's various hospitalizations following her accident of December 24, 1980. Additionally, he had reviewed Dr. Garron's, Dr. Blackman's and Dr. Scuderi's reports. However, Dr. Ziporyn had not interviewed the claimant. Based upon the information he reviewed, it was Dr. Ziporyn's opinion that the claimant's mental condition was either caused or aggravated by her work-related accident of December 24, 1980. The doctor placed importance upon the timing of the claimant's first mental hospitalization and stated that there seldom was an immediate cause and effect in a situation such as the claimant's. He believed that the claimant's two prior back injuries were of crucial importance, as the first trauma "prepares the soil," and after the second and third trauma, a patient's ability to cope is broken down and the symptoms of mental illness occur.

Dr. Ziporyn explained the reason for the variability of the different diagnoses of the claimant's condition. According to the doctor, these diagnoses were technical questions of labelling, and that depression and paranoia were two sides to the same coin. The different terms used to describe the claimant's condition were just different ways of looking at the same issue. He stated that the claimant basically went into a state of psychosis, which is a departure from reality.

The doctor further explained that psychosis can have "key-like scopic variables of presentation." Dr. Ziporyn stated that initially, a situation is inaugurated by anxiety, which at some point becomes overwhelming and the person decompensates or disintegrates. The doctor found that in the claimant's case, she was angry in response to her feelings of vulnerability.

Dr. Ziporyn interpreted the claimant's husband's testimony of the

claimant's hyperactivity as a description of her basic personality structure, which was "an anxious individual and consequently hypersensitive to any stress that would cause an exacerbation of her anxiety." He stated that one of the claimant's basic stress elements was still present, *i.e.,* the atrophy of her knee, and that her knee will always represent a stress element to her. Dr. Ziporyn testified that any stress, any situation which makes the claimant feel inadequate physically or mentally, could precipitate another acute exacerbation of her condition.

Dr. Ziporyn differed with Dr. Garron's opinion that the claimant's mental condition was caused by the time of unemployment after her injury; however, he agreed with Dr. Garron in that the claimant's condition was caused by the claimant's accident. Dr. Ziporyn was of the opinion that the claimant's subsequent mental breakdowns were also related to her work accident of December 24, 1980. His reasoning was that because the claimant had reached the point of decompensation, she would always be prone to breakdowns under any kind of stress, particularly work-related stress.

On cross-examination, Dr. Ziporyn stated that the severity of the claimant's injury was not an issue with regard to her mental condition, and that any kind of trauma (physical) may be sufficient to trigger her condition. Dr. Ziporyn admitted it was possible that if the claimant had a stressful situation at home, that could create the onset of her problem, but he felt that to be highly unlikely. According to Dr. Ziporyn, the real issue, outside of the causation element of the claimant's mental problems, was her feelings of inadequacy and vulnerability.

Dr. Benjamin Blackman, a psychiatrist for 30 years, testified on behalf of the respondent. He testified that he had reviewed the medical records of the claimant from Our Lady of Mercy Hospital, Dr. Haskell's records, Oak Forest Hospital's records, and the records of Family Services, and that he had interviewed the claimant. He admitted that he had not reviewed the records of Southlake, Tinley Park, or Christ Hospital. Likewise, he had not seen Dr. Scuderi's or Dr. Garron's reports. Dr. Blackman gave as his opinion that the claimant's mental condition was not caused by her work-related accident involving her left knee, but that the underlying basis for her psychological disorder was her personal problems. The personal problems of the claimant to which he referred were the claimant's bad marriage and her conflicts with her husband, her son, and her parents. During his interview with the claimant, she would "glaze" over these difficulties.

Dr. Blackman stated that ordinarily a soft tissue injury, such as the claimant's, does not trigger psychological disorders. The doctor believed that the claimant's mental problems predated her injury of December 24, 1980. The basis for his opinion was the claimant's condition upon her first admission to Our Lady of Mercy Hospital and the chronic nature of her mental decompensation. Additionally, the information contained in the records he had, plus his knowledge of the course of mental decompensation, gave support to his opinion that the claimant was emotionally disturbed long before December of 1980. It was his opinion that the claimant's injury occurred while she had the schizophrenia, that the schizophrenia was in "nascent form," and that the claimant's injury was not known to produce schizophrenia. The doctor stated that it was possible that the claimant's injury and the activity brought on by the injury could have aggravated her deep-seated condition; however, he also noted that her domestic problems and parental problems existed at that time as well. Dr. Blackman further stated that if the claimant had a good home life and was well-adjusted, her inactivity of over five months after her injury would have had no adverse effect on the claimant.

A third hearing, at which neither the claimant nor the attorneys were present, was conducted by the arbitrator on May 31, 1985. At that time, the arbitrator admitted into evidence two letters from Dr. Blackman, one dated August 30, 1984, and the other dated September 28, 1984; the results of the claimant's Minnesota Multiphasic Personality Inventory (MMPI); and a letter from Dr. Scuderi dated July 25, 1984, on behalf of the respondent.

Dr. Blackman's letter of August 30, 1984, stated that he had seen the claimant on July 25, 1984, at which time the claimant took an MMPI. Dr. Blackman indicated in his letter that he had determined, from the records he reviewed, that the claimant had a "[s]chizoaffective disorder," that she had a bad marriage, and that she had conflicts with her parents as well as her husband. The letter revealed that the doctor found the claimant's descriptions of her knee injury to be very vague, and her description of her mental illness unsatisfactory. The doctor found the claimant's statements were sometimes inconsistent in that the claimant had reported to the doctor that she and her husband got along well, but then the claimant had told him that her relationship with her husband could be better. She also told the doctor that she got along fine with her parents; however, the claimant's records indicated she had conflicts with them.

Dr. Blackman's letter of September 28, 1984, simply stated that his initial impression of the claimant, that she suffered a severe men-

tal impairment which was far advanced and deep-seated, was confirmed by the claimant's medical records. His conclusions as to the claimant's mental condition were also confirmed by his interview with the claimant.

The results of the MMPI, which was given to the claimant by Dr. Blackman, were as follows:

"The client has responded to the MMPI items in an exaggerated manner, endorsing a wide variety of inconsistent symptoms and attitudes. These results may stem from a number of factors that include random responding; falsely claiming psychological problems; low reading level; a 'plea for help'; or a confused state. The resulting MMPI profile is not a valid indication of the individual's personality and symptoms."

Dr. Scuderi's letter of July 25, 1984, stated that he examined the claimant on that date, at which time the claimant complained of occasional pain and swelling in her left knee, and that her knee bothered her when the weather changed or when she stood or walked for long periods of time. Dr. Scuderi's physical examination of the claimant revealed that she had maximum discomfort over the medial femoral condyle of her left knee; that she had a slight amount of creaking on forced flexion and extension of her knee; that the claimant had a little difficulty with complete extension of her knee; that there was a small amount of swelling present; that there was a slight atrophy of her left knee; and that the claimant walked with a rather careful gait and a slight limp on her left leg. Dr. Scuderi's diagnosis of the claimant's knee was that she had a soft tissue injury to the medial femoral condyle from which she had made a good recovery. Dr. Scuderi found there was no need for further treatment of the claimant's knee and stated that she was able to return to some form of work.

At the review hearing before the Commission, the claimant testified that she had attempted to return to her employment with the respondent. However, Dr. Vivar, her treating psychiatrist, had talked with the claimant's supervisors, and Dr. Vivar was told by her supervisors that the claimant could not return to work in the dietary department as the work would be too much strain on the claimant. The claimant's supervisors referred the claimant to personnel, who in turn referred her to human relations. The claimant was told by the woman in human relations that the respondent had not yet found work for her, but that there might be a possibility of employment. The claimant stated that she had also sought work at the Harvey police department, but that she was told they were not hiring.

The claimant testified that she is currently on the following medi-

cations: lithium, Prolixin and Cogentin. These medications were prescribed by Dr. Vivar, from whom she still received treatment for her psychiatric problems.

As we noted previously, the sole issue raised by the claimant on appeal is whether the Commission's determination that her failure to prove her psychological disability was causally connected to her work accident of December 24, 1980, was against the manifest weight of the evidence. The claimant contends that the medical evidence of Dr. Ziporyn that the claimant's mental problems were caused or aggravated by her work-related injury to her knee was unrefuted; therefore, the Commission's decision was against the manifest weight of the evidence. We disagree.

 It is well established that the claimant has the burden of proving, by a preponderance of the evidence, the elements of his claim, including a showing of causal connection between an employee's disability and his work-related injury; and that it is the province of the Industrial Commission to decide factual questions, to judge the credibility of the witnesses, and to resolve conflicts in the medical evidence. (*Horath v. Industrial Comm'n* (1983), 96 Ill. 2d 349, 449 N.E.2d 1345; *Vestal v. Industrial Comm'n* (1981), 84 Ill. 2d 469, 419 N.E.2d 897; *International Harvester Co. v. Industrial Comm'n* (1970), 46 Ill. 2d 238, 263 N.E.2d 49.) The Commission's findings on medical causation will not be disturbed on review unless it is determined that the Commission's decision is against the manifest weight of the evidence. (*Horath*, 96 Ill. 2d 349, 449 N.E.2d 1345; *International Harvester Co.*, 46 Ill. 2d 238, 263 N.E.2d 49.) In this case, Dr. Ziporyn testified that the claimant's knee injury had caused her mental disability, while Dr. Blackman testified that a soft tissue injury, such as the claimant suffered here, was not known to cause such psychological disability. Clearly, the testimony of the two psychiatrists on whether the claimant's knee injury had caused her mental disability was conflicting. The arbitrator, in her decision, accepted the testimony of Dr. Blackman and determined that the claimant's mental disability was not causally connected to her work accident. Likewise, the Commission, in its determination, held that the evidence was conflicting, adopted the arbitrator's findings wherein the arbitrator accepted Dr. Blackman's testimony and rejected Dr. Ziporyn's testimony on medical causation, and affirmed the arbitrator's decision. As we noted previously, the determination of medical causation and resolving conflicting medical evidence are the province of the Commission, and we conclude that the Commission's decision in this case was not against the manifest weight of the evidence.

██ We also note that the claimant raised a brief alternative argument that, at the least, the claimant's work-related accident of December 24, 1980, aggravated her preexisting condition. The only evidence presented at her hearings by the claimant in this regard was a brief statement by Dr. Ziporyn that her injury either caused or aggravated her mental disability. The remainder of Dr. Ziporyn's testimony was concerned with the aspect that the claimant's injury caused her disability. Dr. Ziporyn gave no basis for an opinion that the claimant's psychological condition was aggravated by her knee injury. The claimant had the burden of proving her claim by a preponderance of the evidence, and we do not find that the claimant met her burden of proving that her accident aggravated her preexisting mental condition. *Vestal,* 84 Ill. 2d 469, 419 N.E.2d 897.

For the foregoing reasons, the judgment of the circuit court of Cook County, confirming the Industrial Commission's decision, is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.